ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI-DJ 2024-062C

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Recurrido<br><br>v.<br><br>**YANZIE VÁZQUEZ GONZÁLEZ**<br><br>Peticionario | TA2025CE00139 | **CERTIORARI** procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón**<br><br>Criminal Núm.:<br>**D V12025G0026**<br>**D DC2025G0004**<br>**D 0P2025G0017**<br>**D LA2025G0074 al 0076**<br><br>Sobre:<br>Art. 93 (A) C.P. (1er Grado)<br>Art. 157, 244 C.P.<br>Art. 6.09 Ley 168 (2 cargos)<br>Art.6.14 Ley 168 |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Aldebol Mora y la Jueza Boria Vizcarrondo.

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de enero de 2026.

Comparece ante nos el señor Yanzie Vázquez González (peticionario) mediante un auto de *certiorari* y nos solicita que revoquemos una *Resolución* emitida el 6 de junio de 2025, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI).[1] Por medio de dicho dictamen, el foro primario denegó la solicitud de desestimación, a tenor con la Regla 64(p) de Procedimiento Criminal, 34 LPRA Ap. II, R. 64(p), presentada por el peticionario.[2]

Por los fundamentos que expondremos a continuación, expedimos el auto de *certiorari* y confirmamos la *Resolución* recurrida.

---

[1] Sistema Unificado de Manejo y Administración de Casos (SUMAC) del Tribunal de Apelaciones, Entrada Núm. 1, Anejo 2. Notificada y archivada en autos el 11 de junio de 2025.
[2] *Íd.*, Anejo 5; véase además, *Íd.*, Anejo 6.

**I.**

El presente caso tiene su génesis el 4 de marzo de 2022, cuando el Ministerio Público presentó seis (6) denuncias contra el peticionario por infringir los Artículos 93(A) (asesinato en primer grado), 157 (secuestro) y 244 (conspiración) del *"Código Penal de Puerto Rico"*, Ley Núm. 146 del 30 de julio de 2012 (Código Penal del 2012), según enmendada, 33 LPRA secs. 5142, 5223, 5334; al igual que los Artículos 6.09 (portación, posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado) (2 cargos) y 6.14(b) (disparar o apuntar armas de fuego) de la *"Ley de Armas de Puerto Rico de 2020"* (Ley de Armas), Ley Núm. 168 del 11 de diciembre de 2019, según enmendada, 25 LPRA secs. 466h, 466m.[3] Según se desprende de las denuncias, el peticionario conspiró y/o se puso de acuerdo con otras personas para secuestrar al señor Julián Luis Rodríguez Milián (Sr. Rodríguez Milián) del Residencial Alhambra en Bayamón y transportarlo al sector El Punto en Santa Olaya localizada en dicho municipio. Asimismo, denunció al peticionario de causarle la muerte al Sr. Rodríguez Milián por medio de disparos, luego de utilizar armas de fuego modificadas para ser disparadas de forma automática, y sin contar con una licencia de armas vigente.

Después de múltiples trámites procesales, comenzó la vista preliminar con el interrogatorio directo del testigo Pablo Jonuel Fuentes Morales (testigo Fuentes Morales) el 27 de diciembre de 2024.[4] Por motivos personales y de salud por parte de la representación legal del peticionario y otro de los coacusados- el señor Ezequiel Olivo Bidó (coacusado Olivo Bidó)- la celebración de la vista fue reseñalada del 18 de febrero de 2025 al 20 de febrero de 2025.

---

[3] *Íd.*, Anejo 3.
[4] *Íd.*, Entrada Núm. 19, Anejo 1.

El 20 de febrero de 2025, el Ministerio Público culminó el directo del testigo Fuentes Morales, los abogados de defensa renunciaron al derecho de contrainterrogarlo y, consiguientemente, el Ministerio Público sometió el caso.[5] Así, el foro primario emitió su determinación. Por medio de dicho dictamen, el foro *a quo* encontró causa contra el peticionario respecto a todos los delitos de epígrafe y pautó el juicio en su fondo para el 25 de marzo de 2025.[6]

Consecuentemente, el Ministerio Público radicó las acusaciones correspondientes contra el peticionario el 21 de febrero de 2025.[7]

Insatisfecho, el peticionario presentó una *Moción de desestimación al amparo de la Regla 64(p) de las de Procedimiento Criminal y el debido proceso de ley* el 10 de marzo de 2025.[8] Arguyó que el 20 de febrero de 2025, durante la vista preliminar, el Ministerio Público demoró dos horas y veinticinco minutos en realizar el directo del testigo Fuentes Morales, terminando el mismo a las 4:45pm. El peticionario planteó que el foro primario actuó irrazonablemente y en detrimento de su debido proceso de ley y sus derechos de contrainterrogar y recibir una adecuada representación legal, al continuar con el contrainterrogatorio fuera de horas laborables, y al no especificar cuánto tiempo se le proveería a cada uno de los abogados de la defensa para ejercer el mismo. De igual modo, sostuvo que el TPI incidió al no otorgar tiempo suficiente para llevar a cabo una lectura adecuada de la declaración jurada del testigo Fuentes Morales y del convenio de inmunidad alcanzado entre este último y el Ministerio Público. Por tal razón, el peticionario suplicó del foro primario la desestimación de las acusaciones presentadas en su contra, al amparo de la Regla 64(p) de

---

[5] *Íd.*, págs. 139-172.
[6] *Íd.*, págs. 172-174.
[7] *Íd.*, Anejo 4.
[8] *Íd.*, Anejo 5.

Procedimiento Criminal, *supra,* y que se ordenara una nueva vista preliminar.

Asimismo, el 22 de abril de 2025, el peticionario radicó una *Segunda moción en solicitud de desestimación al amparo de la Regla 64 (p),* a los efectos de añadir que el Ministerio Público tampoco probó los elementos de los delitos de conspiración y secuestro.[9]

Al siguiente día, el Ministerio Público presentó una *Moción en oposición a la desestimación al amparo de la Regla 64P de las de Procedimiento Criminal y el debido proceso de ley.*[10] Adujo que el examen directo del testigo Fuentes Morales culminó a las 4:25pm aproximadamente y la defensa ya contaba con la declaración jurada del testigo y el convenio de inmunidad previo a la vista. Sostuvo el Ministerio Público que el foro primario no estableció un límite de tiempo para contrainterrogar al testigo de cargo y en varias ocasiones expresó su interés en comenzar el contrainterrogatorio. En cambio, expuso que, luego de una hora dilucidando la misma controversia, los abogados de defensa indicaron que no estarían realizando preguntas durante esa tarde, renunciando así al derecho de contrainterrogar al testigo del estado. Por último, planteó el Ministerio Público haber probado todos los elementos de los delitos imputados contra el peticionario.

El 6 de junio de 2025, el foro primario dictó una *Resolución* en la que denegó la solicitud de desestimación del peticionario.[11]

Inconforme, el peticionario radicó ante nos un auto de *certiorari* el 11 de julio de 2025 donde señaló al TPI por la comisión de los siguientes errores:

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL DECLARAR NO HA LUGAR LA MOCIÓN DE DESESTIMACIÓN BAJO LA REGLA 64 P DE LAS DE PROCEDIMIENTO CRIMINAL, AL CONCLUIR QUE NO HUBO VIOLACIÓN ALGUNA AL DERECHO A UNA**

---

[9] *Íd.*, Anejo 6.
[10] *Íd.*, Anejo 7.
[11] *Íd.*, Anejo 2. Notificada y archivada en autos el 11 de junio de 2025.

**DEFENSA EFECTIVA DEL RECURRIDO YA QUE RENUNCIAMOS A REALIZAR UN CONTRAINTERROGATORIO, CUANDO FUERON LAS ACTUACIONES DE LA JUEZ DE VISTA PRELIMINAR, LAS QUE ABOLIERON EL DERECHO A UNA DEFENSA EFECTIVA, AL RESOLVER QUE LA VISTA SE ACABABA ESE DÍA Y EN ESE MOMENTO. NO SE NOS CONCEDIÓ TIEMPO RAZONABLE PARA REALIZAR UN CONTRAINTERROGATORIO EFECTIVO. LAS ACTUACIONES DE DICH[O] MAGISTRADO CONSTITUYERON UNA LIMITACIÓN IRRAZONABLE AL DERECHO A TENER ADECUADA ASISTENCIA DE ABOGADO. SE VIOLENTÓ CRASAMENTE EL DEBIDO PROCESO DE LEY.**

**ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL NO DESESTIMAR LOS PLIEGOS ACUSATORIOS POR LOS DELITOS DE CONSPIRACIÓN, SECUESTRO Y LOS ARTÍCULOS 6.09 (2 CARGOS) LEY DE ARMAS, YA QUE LA PRUEBA PRESENTADA EN VISTA PRELIMINAR NO CONFIGURÓ LOS MISMOS, AUN EN AUSENCIA DE UN CONTRAINTERROGATORIO EFECTIVO DE LA DEFENSA.**

Por su parte, el Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General de Puerto Rico, (El Pueblo o parte recurrida) presentó un *Escrito en cumplimiento de resolución* el 29 de diciembre de 2025.

Así, con el beneficio de la comparecencia de ambas partes y del expediente ante nos, procedemos a disponer del presente recurso, no sin antes delimitar la normativa jurídica aplicable.

**II.**

**A.**

El auto de *certiorari* es el vehículo procesal que permite a un tribunal de mayor jerarquía revisar las determinaciones realizadas por un foro inferior y cuya expedición descansa en la sana discreción del tribunal. *Rivera v. Arcos Dulces*, 212 DPR 194, 207 (2023); *McNeil Healthcare, LLC v. Municipio de Las Piedras*, 206 DPR 391, 403 (2021). La característica distintiva del auto de *certiorari* "se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos. El concepto *discreción* necesariamente implica la facultad de elegir entre diversas opciones". *IG Builders v. BBVAPR*, 185 DPR 307, 338 (2012)

(bastardillas en el original). No obstante, " 'en el ámbito judicial, la discreción no debe hacer abstracción del resto del Derecho. ... Es decir, *discreción* es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera' ". *IG Builders v. BBVAPR, supra,* pág. 338 (citando a *Pueblo v. Rivera Santiago,* 176 DPR 559, 580 (2009)) (bastardillas en el original); *Torres Martínez v. Torres Ghigliotty,* 175 DPR 83, 98 (2008).

En ese sentido, la Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 42, 215 DPR __ (2025), señala los criterios que debemos tomar en consideración al evaluar si procede expedir el auto de *certiorari. BPPR v. SLG Gómez-López,* 213 DPR 314, 336-337 (2023). La referida regla dispone lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Lo anterior impone al Tribunal de Apelaciones la obligación de ejercer prudentemente su juicio al intervenir con el discernimiento

del foro de instancia, de forma que no se interrumpa injustificadamente el curso corriente de los casos ante ese foro. Por tanto, de no estar presente ninguno de los criterios esbozados, procede que esta Curia se abstenga de expedir el auto solicitado. *Torres Martínez v. Torres Ghigliotty, supra,* págs. 96-97.

**B.**

La Regla 23 de Procedimiento Criminal, *supra,* R. 23, exige la celebración de una vista preliminar en todos los casos de delito grave. *Pueblo v. Rivera Vázquez,* 177 DPR 868, 875 (2010). El propósito principal de la vista preliminar es "evitar que una persona sea sometida injustificadamente a los rigores de un proceso penal". *Pueblo v. Rivera Vázquez, supra,* pág. 875. Específicamente, esta etapa procesal "tiene como noción básica determinar la existencia o no de causa probable para creer que el acusado ha cometido un delito". *Pueblo v. Pérez Delgado,* 211 DPR 654, 664 (2023). Es decir, se debe determinar si existe causa probable sobre dos asuntos; a saber, (1) la comisión del delito grave y (2) su conexión con el imputado. *Pueblo v. Pérez Delgado, supra,* pág. 664. Por tal razón, "no se hace una adjudicación en los méritos sobre la culpabilidad de la persona imputada". *Pueblo v. Rivera Cuevas,* 181 DPR 699, 706 (2011). De hecho, el imputado no queda expuesto a ser convicto en esta etapa de los procedimientos, pues tal como la adjudicación final, ello corresponde a la etapa del juicio. *Pueblo v. Pérez Delgado, supra,* pág. 665.

Cónsono con lo anterior, en la vista preliminar, el peso de la prueba recae sobre el Ministerio Público, y este "deberá tener presente que la prueba ofrecida en la vista debe ser una admisible en el juicio, conforme a los parámetros establecidos en nuestras Reglas de Evidencia". *Pueblo v. Pérez Delgado, supra,* pág. 665; *Pueblo en Interés Menor K.J.S.R.,* 172 DPR 490, 498 (2007). Específicamente, la Regla 103(F) de Evidencia, 32 LPRA Ap. VI, R.

103(F), dispone que "[e]n la vista de determinación de causa para acusar (vista preliminar), aunque las Reglas de Evidencia no obligan, la determinación de causa deberá efectuarse con evidencia admisible en el juicio". Asimismo, las únicas reglas de evidencia aplicables a esta fase procesal son las referentes a los privilegios y al conocimiento judicial. *Pueblo v. Rivera Cuevas, supra,* pág. 707.

Ahora bien, la vista preliminar no supone la celebración de un mini juicio, por lo que el Estado no tiene que presentar toda la prueba que posea contra el imputado. Sin embargo, debe "demostrar que existe evidencia sobre todos los elementos del delito y su conexión con el acusado". *Pueblo en Interés Menor K.J.S.R., supra,* pág. 498; *Pueblo v. Pérez Delgado, supra,* pág. 664. En otras palabras, la responsabilidad probatoria del Ministerio Público en la vista preliminar "se limita a la presentación de una *scintilla* de evidencia que dé paso a una determinación *prima facie* sobre los dos aspectos mencionados". *Pueblo v. Pérez Delgado, supra,* pág. 664; *Pueblo v. Rivera Cuevas, supra,* pág. 706. De este modo, la vista preliminar "opera en términos de probabilidades y su objetivo no es establecer la culpabilidad del imputado más allá de duda razonable, sino constatar que, en efecto, el Estado cuenta con una justificación adecuada para continuar con un proceso judicial más profundo". *Pueblo v. Pérez Delgado, supra,* pág. 665.

Por su parte, el imputado puede contrainterrogar a los testigos de cargo -garantía que emana del derecho constitucional a la confrontación- y a ofrecer prueba a su favor. Regla 23(c) de Procedimiento Criminal, *supra,* R. 23(c); Emda. VI, Const. EE. UU., LPRA, Tomo 1; Art. II, Sec. 11, Const. P.R., L.P.R.A., Tomo 1; *Pueblo v. Pérez Santos,* 195 DPR 262, 269-270 (2016); *Pueblo v. Rivera Vázquez, supra,* pág. 875. De este modo, el imputado tiene oportunidad de establecer que la imputación en su contra es infundada o injustificada. *Pueblo v. Ortiz Rodríguez,* 149 DPR 363,

375 (1999). Asimismo, "[e]l requisito constitucional de todo acusado a confrontarse con los testigos de cargo se satisface si al momento de prestar la declaración hubo la oportunidad de contrainterrogarlo". *Pueblo v. Stevenson Colón,* 113 DPR 634, 638 (1982). "Se satisface también si en la silla de los testigos hay oportunidad de contrainterrogar al testigo que prestó la declaración jurada". *Pueblo v. Stevenson Colón, supra,* pág. 639. Es decir, "el 'requisito constitucional de todo acusado a confrontarse con los testigos de cargo se satisface', si al momento de prestar la declaración hubo la oportunidad de contrainterrogar al testigo o si se le brinda la oportunidad a la defensa de así hacerlo durante el juicio, ya que 'lo crucial en relación con el derecho a la confrontación es que la defensa tenga la oportunidad de contrainterrogar' ". *Pueblo v. De Jesús Ayuso,* 119 DPR 21, 32 (1987) (*citando a Pueblo v. Stevenson Colón, supra,* págs. 638-640). Por tal razón, "el abogado defensor de un acusado puede válidamente renunciar al derecho a contrainterrogar a los testigos adversos". *Pueblo v. Vargas,* 74 DPR 144, 149 (1952). "[I]ndependientemente de si se ha ejercitado el derecho a la confrontación y repregunta en algún procedimiento anterior, el abogado, en representación del acusado puede válidamente renunciar al privilegio de enfrentarse con los testigos de cargo, aun mediante una estipulación en cuanto a la prueba". *Pueblo v. Vargas, supra,* pág. 150. "Si es válida la renuncia a contrainterrogar hecha por un abogado defensor, ello implica la validez de la renuncia a la mera confrontación, ya que, como hemos visto, la repregunta es el fin esencial de la confrontación". *Pueblo v. Vargas, supra,* pág. 150.

De esta forma, "si luego de evaluar la prueba desfilada el juez se convence de que existe causa probable para acusar, debe autorizar que se presente la acusación contra el imputado. De lo contrario, lo debe exonerar y ponerlo en libertad si estaba detenido".

*Pueblo v. Rivera Vázquez, supra,* pág. 875; *Pueblo v. Pérez Delgado, supra,* pág. 665. De haber una determinación de causa probable, esta goza de presunción legal de corrección. *Pueblo v. Pérez Delgado, supra,* pág. 665.

En fin, "(1) el objeto central de la vista preliminar no es hacer una adjudicación en los méritos en cuanto a la culpabilidad o inocencia del acusado; (2) aunque se trata de una función propiamente judicial, no es 'un mini juicio'; (3) el fiscal no tiene que presentar toda la prueba que posea; (4) la vista está encaminada a proteger a la persona imputada a través de un filtro o cedazo judicial por el cual el Estado tiene que pasar prueba, y demostrar si está justificado o no a intervenir con la libertad de un ciudadano y someterlo a los rigores y contingencias de un juicio plenario, y (5) una vez se demuestra y se justifica esta intervención, la vista ha cumplido su propósito de ley". *Pueblo v. Nieves Cabán*, 201 DPR 853, 866 (2019).

## C.

Ahora bien, "cuando el imputado entienda que el Ministerio Público no cumplió con el deber probatorio que le corresponde en esa etapa, puede atacar la determinación de causa probable y rebatir la presunción de corrección, para lo cual tiene disponible el remedio provisto en la Regla 64(p) de Procedimiento Criminal, 34 LPRA Ap. II". *Pueblo v. Pérez Delgado, supra,* pág. 666. De este modo, corresponde al acusado el peso de la prueba para establecer que la decisión de causa probable no fue correcta. *Pueblo v. Pérez Delgado, supra,* pág. 666. Para rebatir la presunción de corrección, "es indispensable que el acusado persuada y demuestre al tribunal que hubo ausencia total de prueba legalmente admisible respecto a alguno de los elementos del delito o en cuanto a su conexión con el delito imputado". *Pueblo v. Nieves Cabán, supra,* pág. 867. El criterio rector es la carencia total de prueba; es decir, no se desfiló evidencia

sobre el particular, por lo que, de no cumplirse con este requisito, no procedería la desestimación de la acusación. *Pueblo v. Nieves Cabán, supra,* pág. 867. En ese sentido, nuestro máximo foro ha expuesto lo siguiente:

> [E]l magistrado que evalúe una moción de desestimación al amparo de la Regla 64(p) debe tener presente que no se trata de una nueva determinación de causa probable. Por lo tanto, si el tribunal entiende necesario la celebración de una vista para dilucidar la moción, su tarea estará limitada a examinar la prueba presentada durante la vista en que se determinó causa probable para acusar. Evaluada *exclusivamente* tal prueba, el magistrado debe determinar si hubo ausencia total de prueba sobre la comisión del delito; ya sea porque no se presentó *alguna evidencia* sobre un elemento del delito imputado o porque no se presentó *alguna evidencia* sobre la conexión del acusado con el delito. Solamente ante una situación de ausencia total de prueba es que procede sustituir el criterio del magistrado que inicialmente halló causa para acusar.

> *Pueblo v. Negrón Nazario,* 191 DPR 720, 736 (2014) (Énfasis suplido en el original).

## D.

Por otro lado, en nuestro ordenamiento jurídico, la comisión del delito de secuestro es sancionada con una pena de reclusión por un término fijo de veinticinco (25) años. Artículo 157 del Código Penal del 2012, *supra,* sec. 5223. Se define el delito de secuestro como "[t]oda persona que mediante fuerza, violencia, intimidación, fraude o engaño, sustrae, o retiene y oculta, a otra persona privándola de su libertad". Artículo 157 del Código Penal del 2012, *supra,* sec. 5223. Específicamente, "[e]l acto prohibido consiste en sustraer a una persona y moverla de un sitio a otro o retenerla allí donde se encuentre y ocultarla, privándola de su libertad". D. Nevares Muñiz, *Código Penal de Puerto Rico,* 4ª ed. rev., San Juan, 2019, págs. 258-259. Para ello se requiere intención o propósito de privar a la persona de su libertad. La intención o violencia puede darse mediante la utilización de medios hipnóticos o sustancias

similares con la capacidad de anular la voluntad de la persona. Nevares Muñiz, *op. cit.*, pág. 259.

Igualmente, "la sustracción del sujeto pasivo puede mediar cualquier tipo de engaño". Nevares Muñiz, *op. cit.*, pág. 259. Esa sustracción implica, no solo retener o mover a la persona de un lugar a otro, sino un elemento de engaño y ocultación. Nevares Muñiz, *op. cit.*, pág. 259. Además, "[c]uando se sustrae a la víctima del lugar en que se encuentre y se mueva del mismo, la sustracción de la víctima debe ser por tiempo o distancia sustancial y no meramente incidental a la comisión de otro delito". Artículo 157 del Código Penal del 2012, *supra*, sec. 5223; *Pueblo v. Rivera Nazario*, 141 DPR 865, 896 (1996).

**E.**

El Código Penal también tipifica el delito de conspiración. Constituye conspiración cuando existe un convenio o acuerdo entre dos o más personas para cometer un delito y estas han formulado planes precisos con relación a la participación de cada uno, al igual que el tiempo y el lugar de los hechos. Artículo 244 del Código Penal, *supra*, sec. 5334. "Ningún convenio, excepto para cometer un delito grave contra alguna persona, o para cometer el delito de incendiar o escalar un edificio, constituye conspiración a no ser que concurra algún acto para llevarlo a cabo, por uno o más de los conspiradores". Artículo 244 del Código Penal, *supra*, sec. 5334. "El acto ulterior requiere actos afirmativos que formen parte del comienzo de ejecución del delito último para el cual se conspiró". Nevares Muñiz, *op. cit.*, pág. 379. Es decir, "para que se configure el delito será necesario que las personas que se han puesto de acuerdo realicen algún acto ulterior para llevar a cabo el propósito del convenio, excepto cuando la conspiración o es con el propósito de cometer un delito grave contra una persona o los delitos de incendio y escalamiento de un edificio". Nevares Muñiz, *op. cit.*, pág. 379.

Igualmente, en los delitos que necesitan un acto ulterior al convenio para configurar el delito de conspiración, cualquiera de los conspiradores puede realizar el mismo. Es decir, tan pronto uno de los conspiradores realice el acto, queda consumado el delito de conspiración. Nevares Muñiz, *op. cit.*, pág. 379. De hecho, independientemente del delito de conspiración que se cometa, si el acto ulterior es de naturaleza delictiva, pues también podría por sí solo generar responsabilidad penal. En esta circunstancia, se trataría como concurso real para propósitos de la pena. Nevares Muñiz, *op. cit.*, pág. 379.

**F.**

Por otra parte, el Artículo 6.09 de la Ley de Armas, *supra,* sec. 466h, tipifica el delito de portación, posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado. Específicamente, dispone lo siguiente:

> Toda persona que porte, posea o use sin autorización de esta Ley un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de estas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal, o cualquier pieza o artefacto que convierte en arma automática cualquier arma de fuego, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de veinticuatro (24) años, sin derecho a sentencia suspendida, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o a cualquier alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de treinta y seis (36) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dieciocho (18) años.
> No constituirá delito la posesión o uso de estas armas en el cumplimiento del deber por los agentes del Negociado de la Policía o por otros agentes del orden público debidamente autorizados. Tampoco constituirá delito la posesión o uso de estas armas según permitido en otros Artículos de esta Ley.

El término portación significa aquella "posesión inmediata o la tenencia física de una o más armas de fuego, cargadas o

descargadas, sobre la persona del portador o a su alcance inmediato. Por alcance inmediato se entenderá al alcance de su mano y la transportación de las mismas". Artículo 1.02(gg) de la Ley de Armas, *supra,* sec. 461a.

### III.

En el presente caso, nos toca dirimir si el foro primario incidió al denegar la solicitud de desestimación bajo la Regla 64(p) de Procedimiento Criminal, *supra,* radicada por el peticionario y al no desestimar los pliegos acusatorios por los delitos de conspiración, secuestro y los cargos al amparo del Artículo 6.09 de la Ley de Armas, *supra,* por ausencia total de prueba respecto a dichos delitos. De igual modo, debemos resolver si el foro primario concedió un tiempo razonable a la representación legal del peticionario para realizar su contrainterrogatorio y si dicho foro limitó irrazonablemente el derecho del peticionario a una adecuada asistencia de abogado.

A juicio del foro primario, procedía denegar la petición de desestimación, a tenor con la Regla 64(p) de Procedimiento Criminal, *supra,* pues quedaron establecidos los elementos de los delitos de secuestro, conspiración y el Artículo 6.09 de la Ley de Armas, *supra,* por medio del testimonio del testigo de cargo, y su conexión con el peticionario. Con relación al contrainterrogatorio, expuso el foro primario que la jueza que atendió la vista preliminar preguntó en más de cinco ocasiones cuál de los abogados iba a comenzar el contrainterrogatorio, quienes finalmente enunciaron que no iban a realizar preguntas, ya que realizarlo implicaba una representación proforma. Además, el TPI indicó que "[r]esulta imperioso resaltar que los abogados de la defensa dedicaron una hora para vapulear a la Jueza que presidía la vista, además que lo hicieron de forma desafiante, altanera e insolente. No seguían las instrucciones que impartía la Jueza, no contestaban sus preguntas, hablaban por

encima de ella cuando se les dirigía y desobedecieron reiteradamente a la Jueza".[12] De igual modo, expuso lo siguiente:

> El Tribunal Supremo de Puerto Rico ha establecido que los abogados que desobedecen las directrices del Juez denotan un grave desprecio a la autoridad del Tribunal y constituye una clara violación al deber de respeto al Tribunal que requiere el Canon 9 del Código de Ética Profesional de los Abogados y Abogadas de Puerto Rico y que el respeto y **la deferencia para con los Jueces trasciende los formalismos de llamarle 'Honorable' o 'Ilustrado"** [sic] *In re Crespo Enríquez*, 147 DPR 656 (1999); *In re Rodríguez Santiago*[,] 160 DPR 245 (2003). En la opinión de *Ríos Mora v. Tribunal Superior*, 95 DPR 117 (1967), se explica que un abogado defensor, además de velar por los derechos del acusado, tiene la obligación de velar que no se interrumpa la justa administración de la justicia.
>
> Si bien es cierto que el derecho de las personas a tener asistencia de abogado en los procesos criminales incluye el derecho a un tiempo razonable para que el abogado pueda entrevistarse con el acusado y para que pueda prepararse para el acto del juicio, dicho derecho no puede ser utilizado por el acusado para obstaculizar el trámite normal de las causas ya que lo que es tiempo razonable varía de acuerdo con las circunstancias de cada caso en particular, así como también que unos **abogados de defensa que han tenido suficiente tiempo para prepararse no pueden, so pretexto de ofrecer una adecuada representación legal, cruzarse de brazos y obstaculizar los procedimientos hasta tanto se les conceda el tiempo adicional que solicitan debido a que esta actitud no solo constituye una indebida obstrucción de la justicia, sino que a su vez lesiona gravemente los derechos del acusado.** *Pueblo v. Rafael García*, 122 DPR 843 (1988).
>
> . . . .[13]

(Énfasis suplido en el original).

Inconforme, el peticionario sostuvo que el foro primario incidió al denegar la solicitud de desestimación, al amparo de la Regla 64(p) de Procedimiento Criminal, *supra*, pues adujo que no se le concedió tiempo razonable para realizar un contrainterrogatorio efectivo. Asimismo, el peticionario arguyó que las actuaciones de la magistrada durante la vista preliminar constituyeron una limitación irrazonable al derecho a tener una adecuada asistencia de abogado,

---

[12] *Íd.*, pág. 7.
[13] *Íd.*, págs. 7-8.

y se le violentó crasamente el debido proceso de ley. Por último, sostuvo el peticionario que el foro primario también erró al no desestimar los pliegos acusatorios de los delitos de conspiración, secuestro y los dos cargos bajo el Artículo 6.09 de la Ley de Armas, *supra*, porque la prueba presentada durante la vista no demostró que se configuraron los mismos.

Por su parte, el Pueblo expresó que los derechos del peticionario no fueron vulnerados, ya que el foro primario brindó múltiples oportunidades para iniciar el contrainterrogatorio. Particularmente, sostuvo que, el 27 de diciembre de 2024, no pudo completarse el directo del testigo de cargo ante la oposición de la defensa, ya que esta había adquirido representación legal nueva ese mismo día. De igual modo, expresó que, aunque la continuación del directo quedó señalada para el 18 de febrero de 2025, el abogado del coacusado Olivo Bidó no compareció por razón de enfermedad. Expresó que, finalmente, el 20 de febrero de 2025, el Ministerio Público completó el directo y, tras culminar el mismo, la defensa solicitó del TPI una fecha posterior para el contrainterrogatorio, ya que era tarde y supuestamente no hubo tiempo suficiente para efectuar el contrainterrogatorio. El Pueblo expuso que el foro primario explicó las gestiones realizadas por dicho foro con el propósito de que se quedaran hasta la culminación de la vista, empero la defensa se negó a iniciar el contrainterrogatorio y, tanto el abogado del peticionario como del coacusado Olivo Bidó, renunciaron al derecho de contrainterrogar. Lo anterior, aun cuando el foro primario no impuso un límite de tiempo para ello.

Por otro lado, El Pueblo arguyó que el peticionario no presentó planteamiento alguno ante el foro primario sobre los delitos de armas, por lo que no los podía introducir por primera vez a nivel apelativo. En cuanto a los delitos de conspiración y secuestro, adujo que la prueba desfilada demostró que el peticionario, en conjunto a

otros individuos, planificaron reunirse para luego llevar a cabo el secuestro de una persona, a quien trasladaron a un lugar solitario, lo bajaron del auto y le dispararon.

Tras un análisis objetivo y cuidadoso, resolvemos que el foro primario no incidió en ninguno de los señalamientos de error planteados por el peticionario.

Tal como expusimos en la sección anterior, "[e]l requisito constitucional de todo acusado a confrontarse con los testigos de cargo se satisface si al momento de prestar la declaración hubo la **oportunidad** de contrainterrogarlo". *Pueblo v. Stevenson Colón, supra,* pág. 638. (Énfasis suplido). "**Se satisface también si en la silla de los testigos hay oportunidad de contrainterrogar al testigo que prestó la declaración jurada**". *Pueblo v. Stevenson Colón, supra,* pág. 638. (Énfasis suplido). Es decir, "el 'requisito constitucional de todo acusado a confrontarse con los testigos de cargo se satisface', si al momento de prestar la declaración hubo la oportunidad de contrainterrogar al testigo o si se le brinda la oportunidad a la defensa de así hacerlo durante el juicio, ya que 'lo crucial en relación con el derecho a la confrontación es que la defensa tenga la oportunidad de contrainterrogar' ". *Pueblo v. De Jesús Ayuso, supra,* pág. 32 (cita omitida). Por tal razón, "el abogado defensor de un acusado puede válidamente renunciar al derecho a contrainterrogar a los testigos adversos". *Pueblo v. Vargas, supra,* pág. 149.

En el presente caso, indiscutiblemente las actuaciones de la magistrada <u>no</u> constituyeron actuaciones irrazonables. En primer lugar, el foro *a quo* recalendarizó la continuación del directo en <u>dos ocasiones</u> a consecuencia de los propios representantes legales de la defensa. Específicamente, el 27 de diciembre de 2024, el Ministerio Público comenzó la celebración de la vista preliminar con el directo del testigo Fuentes Morales. Sin embargo, por medio de

estipulación, el Ministerio Público solicitó la continuación de los procedimientos para el 18 de febrero de 2025.[14] Particularmente, el representante legal del coacusado Olivo Bidó expuso "[e]sa también es la súplica de la defensa y <u>principalmente de este servidor</u> que le dije a su señoría que <u>necesitaba un tiempo adicional para prepararnos efectivamente</u> para el proceso y ahora empezamos y la súplica es que entonces nos conceda esa continuación para entonces entrar a continuar la vista en su totalidad, en sus méritos, en la próxima fecha".[15] (Énfasis suplido). De igual modo, el abogado del peticionario arguyó "[s]í juez, estamos de acuerdo".[16] Por tanto, el TPI recalendarizó la continuación de la vista preliminar para el 18 de febrero de 2025 a las 9am.[17]

Al comenzar la continuación de la vista el 18 de febrero de 2025, los abogados de la defensa todavía no habían comparecido.[18] El alguacil del foro primario informó que el representante legal del peticionario "llamó como a las 9:30 de la mañana, su secretaria se comunicó con nosotros pidiendo un turno posterior para las 10:30 porque se le había explotado una goma al carro e iba a llegar más tarde".[19] Por su parte, el abogado del coacusado Olivo Bidó le había escrito un texto a una de las fiscales "indicando que tenía influenza, sin embargo, lo que informa es que él dio positivo el jueves y no nos lo vino a decir hasta esta mañana".[20] Luego de un receso, compareció el representante legal del peticionario.[21] Consiguientemente, el foro primario evaluó la evidencia del incidente de la goma,[22] y por medio de una llamada telefónica, solicitó del abogado del coacusado Olivo Bidó la prueba médica

---

[14] *Íd.*, Entrada Núm. 19, pág. 18, L 6-11.
[15] *Íd.*, L 13-17.
[16] *Íd.*, L 19.
[17] *Íd.*, L 20-22.
[18] *Íd.*, pág. 22, L 1-13.
[19] *Íd.*, L 18-20.
[20] *Íd.*, L 21-22; pág. 23, L 1-2.
[21] *Íd.*, pág. 29, L 6-22; pág. 30, L 1-12.
[22] *Íd.*, pág. 37, L 20-22; pág. 38, L 1-22; pág. 39, L 1-11.

relacionada a la influenza.[23] Posteriormente, el foro primerio recalendarizó la vista nuevamente.[24]

Ahora bien, también surge indudablemente de la porción de la TPO correspondiente al 20 de febrero de 2025, fecha en la que culminó la vista preliminar, que el foro primario concedió a los abogados de la defensa <u>múltiples</u> oportunidades para realizar el contrainterrogatorio, más optaron por renunciar a dicho derecho. Veamos.

Al Ministerio Público culminar con el directo del testigo de cargo, el representante legal del coacusado Olivo Bidó solicitó la declaración jurada de dicho testigo, y, justo luego de recibirla, suplicó del foro primario la oportunidad de leer la declaración.[25] De igual modo, el abogado del peticionario solicitó una copia. Ambas peticiones fueron concedidas, junto a un breve receso para ello.[26] Ante ello, el representante legal del peticionario sostuvo lo siguiente:

> Lcdo. Gordon P.: (02:13:37) Deja que me las traigan que le están sacando copia. Juez, viendo la hora, yo no creo, no auguro que terminemos.
>
> Jueza Camareno: No, ya yo hice todos los arreglos, hoy nos vamos cuando se acabe esto.
>
> Lcdo. Gordon P.: Pero yo no hice los arreglos, honorable, no se nos consultó que nos íbamos a extender de las 5:00 de la tarde.
>
> Jueza Camareno: Pero es que lo íbamos a ver hoy.
>
> Lcdo. Gordon P.: Pues vamos...
>
> Jueza Camareno: Se va a extender hoy, este caso lo vamos a ver hoy.
>
> Lcdo. Gordon P.: Con el mayor de los respetos, honorable.
>
> Jueza Camareno: Si.
>
> Lcdo. Gordon P.: Yo no tengo disponibilidad en la tarde de hoy.

---

[23] *Íd.*, pág. 39, L 11-22.
[24] *Íd.*, pág. 40, L 9-16.
[25] *Íd.*, pág. 139, L 17-20; pág. 140, L 1-6.
[26] *Íd.*, pág. 140, L 4-15.

Jueza Camareno: (02:14:06) Pues yo con el mayor de los respetos, lo vamos a ver hoy, estamos acabando, estamos acabando y el tribunal lo va a ver hoy. Ese es el entendido y ya el tribunal pidió permiso, todo el mundo tiene permiso aquí para terminar esto hoy.

Lcdo. Gordon P.: Hacemos constar que tiene nueve páginas la declaración jurada legal, papel legal.

. . . .[27]

Además de solicitar tiempo para examinar la declaración jurada, el abogado del peticionario expresó que:

Lcdo. Gordon P.: Juez pedimos permiso, yo no he comido.

Jueza Camareno: Bueno, pueden darle, eso habla usted con la secretaria, y le da provisiones, esta todo y esto realmente si empezamos ya lo vemos.

Lcdo. Gordon P.: Ah, pero para estar porque después cuando llegue la comida (Ininteligible).

Jueza Camareno: Eso es así, no hay problema. Falta la fiscal, ¿verdad?

Fiscal Pérez: Salió al baño un momento.

Jueza Camareno: Ok. Tan pronto llegue la fiscal comenzamos.

Lcdo. Gordon P.: (02:17:33) Vamos por el primer párrafo de la segunda página, honorable.

Jueza Camareno: Pues tiene cinco minutos, estoy contando.

Lcdo. Gordon P.: Y nueve páginas, honorable.

Jueza Camareno: En cinco minutos los puede leer. Y ustedes la tenían previamente también.

Lcdo. Gordon P.: Estamos corroborando que sea la misma, honorable.

Jueza Camareno: Pues bien, corrobore, en cinco minutos yo creo que está bien. Se le va a dar diez minutos, ¿está bien?

Lcdo. Castro: Juez, esta persona tiene un convenio de inmunidad que tampoco nos han entregado, o sea...

Jueza Camareno: Pues cuando esté la fiscal, hablan sobre eso, esto es una vista preliminar y (02:18:48) lo estamos viendo como una vista preliminar, es importante que sepan que el Tribunal Supremo ha dicho que esto no es un mini juicio, vamos a acabar en

---

[27] *Íd.*, pág. 140, L 18-20; *Íd.*, pág. 141, L 1-15.

el día de hoy, se hicieron todos los arreglos para acabar este caso en el día de hoy, y lo vamos a ver en el día de hoy. Cualquier planteamiento en derecho me lo dejan saber, tienen diez minutos para leerla, leer, no leerla, para verificar si la que ustedes tienen es la misma, con ojeando las páginas yo creo que es suficiente, diez minutos.

Lcdo. Castro: ¿Y el convenio?

Alguacil: Se reanuda la sesión en la tarde de hoy, favor tomar asiento y mantener estricto y total silencio en sala.

Jueza Camareno: Falta la fiscal, ¿verdad?

Fiscal Pérez: Fue que ella fue un momento a la oficina.

Lcdo. Gordon P.: (02:20:05) Fue a buscar un convenio porque también hay un convenio que no nos han entregado, honorable.

Jueza Camareno: Ok.

Lcdo. Castro: Sí, yo se lo dije a la juez.

**Jueza Camareno: Si. Pueden sentarse. Comenzaríamos con el contra, ¿verdad?**

**Ya mismo. ¿Quién va a comenzar? ¿Castro o Gordon?**

Lcdo. Castro: Le vamos a hacer un planteamiento de derecho, juez.

Lcdo. Gordon P.: Nos interesa saber cuánto tiempo vamos a tener para hacer el contrainterrogatorio, honorable, debido a que la...

Jueza Camareno: Eso es especulativo, vamos a empezar y le decimos cualquier cosa.

Lcdo. Gordon P.: (02:20:51) No, bueno pues como sabemos que las compañeras han tenido aproximadamente dos horas y media...

Jueza Camareno: No es que yo no, eso no depende...

Lcdo. Gordon P.: ...entre las interrupciones que ha habido.

Jueza Camareno: ...eso no es una certeza matemática, eso va fluyendo, obviamente, así que...

Lcdo. Gordon P.: **Nuestra pregunta es, ¿si nos vamos a tener dos horas y media cada uno de nosotros para hacer preguntas, honorable?**

Jueza Camareno: **Eso yo no lo sé, lo saben ustedes.**

Lcdo. Gordon P.: No, ¿si se nos va a permitir eso, honorable? Es la pregunta.

Jueza Camareno: Es que eso, yo no voy a contestar cosas especulativas, ustedes hacen su (02:21:17) trabajo y ustedes ni saben cuánto va a durar porque ustedes no tienen un timer al lado, o sea, ustedes hagan su trabajo y ya, no me pregunten a mí, cosas que desconozco. Yo creo que podemos empezar porque está la fiscal Mónica Díaz.

Fiscal Pérez: Pérez Díaz.

Lcdo. Castro: Es que necesitamos el convenio.

Lcdo. Gordon P.: Hay un convenio, honorable, que tiene que ver con este caso.

Fiscal Pérez: Sí juez, ya la compañera está subiendo.

Jueza Camareno: Ok, perfecto.

Fiscal Pérez: Lo que fue, fue precisamente a buscar el convenio.

Lcdo. Gordon P.: Que es parte de lo que podríamos contrainterrogar al caballero. Tengamos (02:22:16) tiempo para leerlo igualmente, honorable.

. . . .[28]

(Énfasis suplido).

Ante lo anterior, el foro primario preguntó nuevamente cuál de los representantes legales iba a comenzar el contrainterrogatorio:

**Jueza Camareno: Mire ese no es el problema, el problema es que yo estoy, usted sabe que los tribunales, el juez es que delimita, verdad, cómo se corren los procesos, obviamente, entendemos eso claramente, pero quisiera comenzar con el contra, eso es sencillo, ¿Quién de los dos va a comenzar?**

Lcdo. Gordon P.: (02:23:10) Honorable, lo que pasa es que se nos está dejando preparar adecuadamente con...

**Jueza Camareno: Pero es que usted ya tenía, ustedes llevan dos meses preparándose.**

Lcdo. Gordon P.: No, porque no tenemos el convenio, honorable, no teníamos la declaración jurada que se estaba presentando aquí.

. . . .

**Jueza Camareno: ...desde el 27 de diciembre viendo esta vista y ustedes son excelentes abogados ambos, ahora me vienen "no, que no me han dado", mire,**

---

[28] *Íd.*, pág. 142, L 5-22; pág. 143, L 1-20; pág. 144, L 1-20; pág. 145, L 1-9.

**ustedes tienen que ser diligentes también, yo le estoy preguntando que cuál de los dos va a comenzar el contra que tenemos que comenzar hoy y ustedes podían haber solicitado eso antes.**

Lcdo. Gordon P.: Si nos permite ver el convenio y podemos…

Jueza Camareno: Te lo voy a permitir porque lo estoy diciendo, es [el] rulling es el siguiente: ustedes tuvieron tiempo suficiente, esto es una vista preliminar, son treinta días para verse o sesenta, eso es lo que dispone las reglas de procedimiento criminal, llevamos ochenta y siete días y ustedes tenían tiempo suficiente para haber precavido eso.

Lcdo. Gordon P.: En cuanto a los términos de enjuiciamiento rápido fueron interrumpidos en la vista pasada.

Jueza Camareno: No, no, no. En las vistas preliminares son vistas preliminares, no son mini juicios. Así es que, ese planteamiento lo tenían que haber hecho antes, así es que yo, vamos a darle eso….

Lcdo. Gordon P.: La obligación, la obligación es del Ministerio Público, honorable.

**Jueza Camareno: …pero vamos a continuar con el contra ahora.**

Lcdo. Gordon P.: La obligación es del Ministerio Público, de proveer ese documento.

Jueza Camareno: (02:24:49) Y usted lo está diciendo ahora.

Lcdo. Gordon P.: Pues, pero…

Jueza Camareno: Pues no, mire, se le va a proveer, pero le estoy preguntando que quién, cuál de los dos va a comenzar con el contra.

Lcdo. Gordon P.: Nosotros, yo, eh…

**Jueza Camareno: Mire, le voy a dar, le voy a dar cinco minutos para eso y vamos, y cuando yo llegué aquí, empieza uno de los dos con el contra, cinco minutos más.**

Alguacil: Todos de pie, breve receso del Tribunal, pueden tomar asiento. El Tribunal reanuda la sesión de la tarde, se pueden sentar, por favor.

**Jueza Camareno: Vamos al contra, ¿Quién va a comenzar?**

. . . .[29]

---

[29] *Íd.*, pág. 145, L 18-20; pág. 146, L 1-7, 16-20; pág. 147, L 1-20; pág. 148, L 1-5.

(Énfasis suplido).

A pesar de lo anterior, los abogados de defensa optaron por no realizar el contrainterrogatorio:

> Jueza Camareno: Mire, no ha lugar, vamos a continuar. O sea, ya yo di el rulling, vamos a continuar, continúen, cuál, si van a contrainterrogar tienen ese derecho, si lo renuncian, lo pueden renunciar, continuamos.
>
> **Lcdo. Castro: De parte del señor Ezequiel Olivo Bidó, su representación legal no va a hacer ninguna pregunta.**
>
> Jueza Camareno: Gracias.
>
> Lcdo. Gordon P.: Si esa es la determinación del tribunal...
>
> Jueza Camareno: Bueno, esa no es, ustedes tienen el derecho, esto es una vista preliminar, esto no es mini juicio, se les está dando la oportunidad y ustedes parecerían que no quieren continuar con la vista.
>
> Lcdo. Gordon P.: No, no, honorable, con mucho respeto.
>
> Jueza Camareno: Así es que yo le estoy diciendo y lo estoy dejando claro que tienen derecho a contrainterrogar y que comiencen el contrainterrogatorio, cualquiera, ya el licenciado Castro renunció, no hay ningún problema, lo dijo claro. Gordon.
>
> Lcdo. Gordon P.: (02:48:47) Si, honorable.
>
> . . . .
>
> Lcdo. Gordon P.: **Así las cosas, no vamos a estar haciendo preguntas, honorable.**
>
> Jueza Camareno: Gracias.
>
> . . . .
>
> (Énfasis suplido).[30]

De lo anterior se puede colegir que, a pesar de las continuas preguntas del foro primario para comenzar con el contrainterrogatorio, la representación legal de la defensa continuó obstaculizando la celebración de la vista preliminar. De hecho, ello ocurrió aun cuando el TPI advirtió que dicha vista había comenzado

---

[30] *Íd.*, pág. 167, L 3-18; pág. 169, L 16-17.

en diciembre y el término para celebrar la misma era de treinta (30) días, dado a que los acusados estaban sumariados. Expuso que tuvieron 87 días para prepararse para la vista y que la misma no era un *mini juicio*. Es importante indicar, además, que el Ministerio Público comunicó en la vista preliminar haber realizado arreglos para viajar al testigo a la vista previamente calendarizada, lo que conllevó costos para el Estado.[31]

En particular, los representantes legales de la defensa entorpecieron el contrainterrogatorio con razones inmeritorias como no haber comido y realizaron preguntas sobre la duración del contrainterrogatorio, asunto que dependía de los propios abogados de la defensa, tal como expuso el TPI. Además, solicitaron recesos para leer una declaración jurada del testigo de cargo y un convenio de solo 9 páginas cada uno, peticiones que el foro primario les concedió. Incluso, la defensa tenía la declaración jurada previo a la celebración de la vista el 20 de febrero de 2025.

Sin duda, ese mismo día, el TPI accedió a todas las súplicas de la defensa incluyendo recalendarizar la vista por tercera ocasión para el siguiente día, a lo que también se opusieron los abogados de los acusados y propusieron moverla para marzo. Más importante aún, el foro primario en ningún momento limitó el tiempo del contrainterrogatorio ni mucho menos violentó ese derecho constitucional. Tampoco afectó la adecuada representación legal del peticionario. En cambio, los propios abogados de la defensa brindaron un sinnúmero de excusas para no llevar a cabo el contrainterrogatorio, renunciando, finalmente, a dicho derecho constitucional que les cobija a sus clientes. Por tal razón, el foro primario no incurrió en el primer señalamiento de error.

---

[31] *Íd.*, pág. 22, L 21-22; pág. 23, L 1-14; pág. 28, L 13-16; pág. 156, L 15-20; pág. 157, L 1-4.

Por otro lado, y como pormenorizamos anteriormente, el delito de conspiración es definido como el convenio o acuerdo entre dos o más personas para cometer un delito y estas han formulado planes precisos con relación a la participación de cada uno, al igual que el tiempo y el lugar de los hechos. Artículo 244 del Código Penal, *supra,* sec. 5334. Por su parte, el delito de secuestro consiste en "[t]oda persona que mediante fuerza, violencia, intimidación, fraude o engaño, sustrae, o retiene y oculta, a otra persona privándola de su libertad". Artículo 157 del Código Penal del 2012, *supra*, sec. 5223. Específicamente, "[e]l acto prohibido consiste en sustraer a una persona y moverla de un sitio a otro o retenerla allí donde se encuentre y ocultarla, privándola de su libertad". D. Nevares Muñiz, *op. cit.*, págs. 258-259. Para ello se requiere intención o propósito de privar a la persona de su libertad. Nevares Muñiz, *op. cit.*, pág. 259.

En el presente caso, y, por medio del testimonio del testigo Fuentes Morales, se demostró que el peticionario era miembro y gatillero de una organización llamada la Familia Nunca Muere (FARC).[32] El testigo Fuentes Morales expresó que él, el peticionario y otros miembros de la organización llevaron a cabo un acuerdo para asesinar a una persona.[33] Para ello, determinaron que todos vestirían de negro y llegarían hasta el estacionamiento del Colegio Santo Domingo en la Playita-sector de Santurce.[34] Según el testimonio del testigo Fuentes Morales, de ahí se movieron al residencial Llorens Torres, a tres o cinco minutos de la Playita.[35] Luego de una reunión entre los líderes del grupo en dicho residencial,[36] se retiraron y guiaron hasta el residencial Alhambra en Bayamón donde uno de los miembros buscó al Sr. Rodríguez

---

[32] *Íd.*, pág. 16, L 12-14; pág. 50, L 6.
[33] *Íd.*, pág. 71, L 8-19.
[34] *Íd.*, pág. 73, L 10-12; pág. 17, L 21.
[35] *Íd.*, pág. 74, L 12-20; pág. 75, L 1-20; pág. 77, L 11-15; pág. 78, L 5-8, 13-18; pág. 80, L 7-10.
[36] *Íd.*, pág. 80, L 14-18.

Milián.[37] Mediante intimidación y violencia, cinco de los miembros, inclusive al peticionario, apuntaron al Sr. Rodríguez Milián con un arma de fuego, y lo sustrajeron de allí.[38] Así, guiaron durante quince a veinticinco minutos aproximadamente hasta el sector El Punto en Santa Olaya localizada en Bayamón.[39] Allí, el peticionario le apuntó con un arma de fuego al Sr. Rodríguez Milián, la que se le trancó. A pesar de esto, le entregaron al peticionario otra pistola y con esta disparó contra el Sr. Rodríguez Milián, quien tenía las manos amarradas con *straps*. Al caer este último al piso, el peticionario continúo disparándole y los demás miembros se unieron con sus respectivas armas de fuego.[40]

En esa misma línea, también expusimos en la sección anterior que el Artículo 6.09 de la Ley de Armas, *supra*, tipifica el delito de portación, posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado; elementos que también se demostraron en la vista preliminar. Conforme al testimonio del testigo Fuentes Morales, el peticionario portó una Glock 19X, color crema, de calibre 9 milímetros, una de las armas que fue convertida por el testigo en automática.[41] Cuando se trancó dicha arma, el peticionario utilizó una Glock 22, color negro, de calibre .40, portada y modificada por otros miembros, para asesinar al Sr. Rodríguez Milián. De igual modo, las partes estipularon la certificación negativa de licencia de armas del peticionario.[42]

Recuérdese que la vista preliminar no supone la celebración de un mini juicio, por lo que el Estado no tiene que presentar toda la prueba que posea contra el imputado, pues "basta con 'demostrar

---

[37] *Íd.*, pág. 81, L 7, 12-17; pág. 82, L 11-17.
[38] *Íd.*, pág. 84, L 18-20; pág. 85, L 1-20; pág. 86, L 1-20; pág. 91, L 16-18; pág. 97, L 17-20; pág. 98, L 1, 15-20; pág. 99, L 9-14.
[39] *Íd.*, pág. 101, L 15-20; pág. 102, L 1-4, 12-13; pág. 103, L 2-5, 10-20; pág. 104, L 1-6, 12-20; pág. 105, L 1-20; pág. 106, L 1-3.
[40] *Íd.*, pág. 107, L 3-20; pág. 108, L 1-13; pág. 105, L 4-18.
[41] *Íd.*, pág. 90, L 11-13, 20; pág. 91, L 1-6; pág. 107, L 19-20; pág. 108, L 1-3; pág. 118, L 14-20; pág. 119, L 1-7.
[42] *Íd.*, pág. 14, L 16-19.

que existe evidencia sobre todos los elementos del delito y su conexión con el acusado' ". *Pueblo en Interés Menor K.J.S.R.*, *supra*, pág. 498; *Pueblo v. Pérez Delgado*, *supra*, pág. 665. En otras palabras, la responsabilidad probatoria del Ministerio Público en la vista preliminar "se limita a la presentación de una *scintilla* de evidencia que dé paso a una determinación *prima facie* sobre los dos aspectos mencionados". *Pueblo v. Pérez Delgado*, *supra*, pág. 664; *Pueblo v. Rivera Cuevas*, *supra*, pág. 707. De este modo, la vista preliminar "opera en términos de probabilidades y su objetivo no es establecer la culpabilidad del imputado más allá de duda razonable, sino constatar que, en efecto, el Estado cuenta con una justificación adecuada para continuar con un proceso judicial más profundo". *Pueblo v. Pérez Delgado*, *supra*, pág. 665. Precisamente, en el caso de epígrafe, el Ministerio Público demostró <u>todos</u> los elementos de los delitos de secuestro, conspiración y del Artículo 6.09 de la Ley de Armas, *supra*. Por ende, el foro primario tampoco incurrió en el <u>segundo</u> señalamiento de error.

## IV.

Por las razones discutidas anteriormente, resolvemos expedir el auto de *certiorari* y confirmar el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones